Filed 10/11/23  P. v. Deichman CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID JAMES DEICHMAN,<br><br>    Defendant and Appellant. | F083573<br><br>(Super. Ct. No. CR-18-002974)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Kellee C. Westbrook, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

The trial court sentenced defendant David James Deichman to a total term of 53 years and eight months to life in prison after a jury convicted him of sexually abusing, annoying, and molesting his minor cousins.  On appeal, defendant argues that (1) the trial court erred in denying his motion to exclude his statement to law enforcement, (2) counsel was ineffective by failing to move to suppress digital evidence seized from defendant's cellular phone, (3) the trial court abused its discretion in admitting evidence of uncharged sexual offenses, and (4) the trial court violated his right to due process by instructing the jury that they could use uncharged nonsexual offense conduct as evidence of his propensity to commit the charged offenses.

We conclude the trial court erred in admitting evidence that defendant unlawfully attempted to video activities in his neighbor's bedroom under Evidence Code section 1108 but find that admission of such evidence was harmless, reject defendant's other arguments, order a correction be made to the abstract of judgment, and otherwise affirm the judgment.

# PROCEDURAL BACKGROUND

The District Attorney of Stanislaus County filed an information on May 15, 2019, charging defendant with aggravated sexual assault of a child (Penal Code, § 269, subd. (a)(4);[1] counts 1–3), lewd acts upon a child (§ 288, subd. (a); counts 4–5), using a minor for posing or modeling involving sexual conduct (§ 311.4, subd. (c); count 6), and annoying and molesting a child (a misdemeanor) (§ 647.6, subd. (a)(1); count 7).  The information also alleged, as to counts 1–3, that the crimes involved the same victim on separate occasions (§ 667.6, subd. (d)).  Defendant pleaded not guilty and denied the allegations.

---

[1]     Undesignated statutory references are to the Penal Code.

After a nine-day trial, the jury returned a verdict of guilty on August 13, 2021, as to all counts and found true the allegation that the abuse involved the same victim on separate occasions.  The trial court sentenced defendant to a total term of 53 years and eight months to life in prison on October 22, 2021, as follows:  consecutive terms of 15 years to life as to counts 1–3, six years as to count 4; 2 years as to count 5; eight months as to count 6; and a concurrent term of 180 days in jail as to count 7.  The trial court also ordered defendant to pay a $300 restitution fine (§ 1202.4, subd. (b)) and a $300 parole revocation restitution fine (§ 1202.45).[2]

Defendant filed a timely notice of appeal on November 18, 2021.

## FACTS

### I.   Prosecution evidence.

#### A.   Jane Doe 1

Doe 1 testified that defendant was her older cousin,[3] the son of her mother's brother.  When Doe 1 was 12 or 13 years old, in approximately August 2017, defendant first behaved inappropriately with her.  Doe 1 lay on the floor in her living room with defendant, her mother, brothers, Jane Doe 2, and Jane Doe 3, who were all in the dark and either watching a movie or sleeping.  Defendant was on the couch behind where she lay.  Defendant grabbed her arm and raised it until it was resting on his thigh by is private area.  She tried to move her hand away, but defendant repeatedly placed it back on his thigh and possibly his penis.  This continued for approximately 10 to 15 minutes.

---

[2]    The indeterminate abstract of judgment, at paragraph 12, reflects a $900 probation report fee that is also reflected in the October 22, 2021 minute order.  The trial court's oral pronouncement of judgment did not order defendant to pay this fee, and we shall order it stricken.  When a discrepancy exists between a trial court's oral pronouncement of judgment and the minute order, the oral pronouncement controls.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  We shall order that the abstract of judgment be amended to conform to the trial court's oral pronouncement.

[3]    The parties stipulated that defendant was born in August 1993.

Defendant then went outside to smoke. Defendant returned and lay next to her on the floor. Eventually, the only individuals left in the room were Doe 1, defendant, and Doe 1's seven and eight-year-old brothers who were asleep on the couch. Defendant moved Doe 1's blanket to cover them both, and she saw his penis was exposed. Defendant placed Doe 1's hand on his thigh again and then moved her hand to his penis. She pulled her hand away and turned on her side away from him. Doe 1 tried to ignore defendant and pretended to be asleep, but defendant massaged her back and lower back. Doe 1 was too scared and confused to tell defendant to stop.

Defendant acted inappropriately towards Doe 1 a second time a few months later while she was at his house. Doe 1 had been watching a movie with defendant and a few other family members and lay on the couch. When defendant returned from the rest room, Doe 1 and defendant were the only individuals still awake. Defendant stood next to where Doe 1 lay on the couch and grabbed her face as she pretended to be asleep. When Doe 1 would not open her mouth, defendant turned her head towards him, plugged her nose, which forced her to open her mouth, and put his penis into her mouth. Defendant then moved his body back and forth for approximately five minutes. Defendant also put his hand down her shirt and underneath her bra. Doe 1 was very scared and  pretended to be asleep.

In February 2018, defendant placed his penis into Doe 1's mouth again. Doe 1 was sleeping over at defendant's house on the couch. Defendant moved his hand around on her shirt while rubbing her breast, he lifted her shirt, and she saw a flash consistent with defendant having taken her picture. Defendant plugged her nose to force her to open her mouth and placed his penis inside. Defendant then moved his body back and forth. Doe 1 tried to move her head away, but defendant forcefully pushed it back. The incident lasted approximately five minutes, and Doe 1 was scared. After one of these incidents, defendant ejaculated into her mouth.

4.

The fourth incident occurred in May 2018 while Doe 1 was sleeping in the backyard of defendant's residence with her sister and her best friend. At approximately 3:00 a.m., defendant lay next to her. Defendant moved Doe 1's face to see if she was awake, but she pretended to be asleep. Defendant leaned into Doe 1's face, plugged her nose, and put his penis into her mouth. Defendant then moved his body back and forth.

Doe 1 did not tell her family about it until approximately June 2018, when Doe 2 told Doe 1 that the same thing had happened to Doe 2. They contacted the police the following day.

**B.     Jane Doe 2**

Doe 2 was 21 years old at the time of trial and testified that defendant was her older cousin on her mother's side. Defendant behaved inappropriately with her when she was eight and 15 years old. When Doe 2 was 15 years old and living at defendant's house, she lay on the bed in defendant's mother's room while watching television. Defendant entered and lay down next to her. Defendant told her to use her hand and trace her fingers along him. Defendant then asked her to touch his penis and moved her hand to his penis, inside his pants but over his underwear. Doe 2 was scared, but felt she had to do as he asked because he was older than her. Another uncle walked into the room and was very upset, although he did not see everything. Defendant got into an argument with the uncle. Defendant told Doe 2 to tell his mother that their uncle was lying. Around this same time, defendant would message Doe 2 and ask her to send him photographs of her naked breasts.

Defendant also acted inappropriately when Doe 2 was eight years old, in 2008. Doe 2 was in defendant's room with Doe 3, who was eight years old at the time. Defendant was 15 or 16 years old. Defendant offered them candy if they would suck his penis. Defendant told Doe 2 and Doe 3 that they would play a game to see who could suck his penis the longest. Doe 2 felt that she had to perform oral sex. Defendant also

5.

showed them a cartoon of Disney pornography where the cartoon characters were nude and having sexual intercourse. This happened between five and 10 times when she was eight years old. Doe 2 eventually told defendant's mother, but she instructed them not to say anything about it.

Doe 2 told Doe 1's mother about the abuse after Doe 3 had opened up to others as to what had happened.

### C.     Jane Doe 3

Doe 3 was 23 years old at the time of trial. She testified that she grew up with defendant and their parents were friends. When Doe 3 was 10 years old, defendant told her to go into his bedroom because he wanted a massage. She went into the room with Doe 2. Defendant closed the door to the room and turned on a porn movie. They danced around him and then defendant lay on the bed and had them massage his back with his pants down and buttocks exposed. Defendant turned over, touched himself, and put a lubricant on himself. Then defendant had Doe 3 place her mouth on his penis and, when she was uncomfortable, had her try it in different positions. She did this two times for approximately three or four minutes each time.

Doe 3 saw Doe 2 put her mouth on defendant's penis but tried not to look thereafter. Doe 3 testified Doe 2 told defendant's mother what had happened, but that Doe 3 denied it when asked.

In 2018, Doe 3 told Doe 1's mother that defendant sexually abused her and Doe 2 because she knew that Doe 1 and her cousins frequented defendant's house and was concerned for them.

### D.     Defendant's Statement

Modesto Police Detective Randy Angle interviewed defendant at his home and videoed the interview using his body camera. The 16-minute interview was admitted into evidence and played for the jury.

The video showed that defendant answered his front door after Angle knocked several times. Angle stated, "Hi, how are ya? Are you David?" Standing at the door, defendant responded, "Yeah." Angle identified himself and asked, "Uh, do you have a second to talk?" Defendant responded, "Yeah." Defendant's dog was at the door, and Angle asked, "Can you put the—can you just shut the door really quick?" Defendant stepped out onto his porch and closed the door. A second officer stood just off the porch leaning against a post in front of the residence. Angle requested and received permission to pat down defendant to check for weapons; defendant was in possession of a phone.

Angle explained that he was there to ask about an incident that may have occurred with Doe 1, whom defendant identified as his cousin. Defendant denied knowledge of any incident involving Doe 1 and a trampoline. Upon specific questioning, defendant denied any sexual relationship with Doe 1, exposing his penis to her, and taking photographs of her while she was naked. Defendant claimed that he would never do that to his cousin and then stated, "No, I swear to God, put that on my soul, I'd never in my life do that." When Angle asked why Doe 1 said such things, defendant opined that she was mad that he would not take her and her friends to get something to eat. Angle commented that it was weird to think that they would make these accusations for that reason. Defendant told Angle that he was aware that Doe 1's friend was also making the same type of complaint, but he did not know her name.

Angle asked defendant about his other cousin who was either 18 or 20 years old at that time, and defendant identified her as Doe 2 but denied ever touching her inappropriately. Angle asked if defendant had his cousins perform oral sex on him and he responded, "Never in my life." Angle then inquired about Doe 3 and asked if she had performed oral sex on him. Defendant said that Doe 3 performed oral sex on him at her house when he was nine years old and she was four or five years old. Defendant described that Doe 3 was watching a porn movie while he slept, and he woke to find her

7.

trying to perform oral sex on defendant. Angle expressed surprise that a four-year-old was watching a porn movie.

Defendant told Angle that defendant could not describe the incident any better because he could not remember it. Angle told defendant that multiple people accused him of inappropriately touching them or making them orally copulate him and that, "It's gonna be better off … I've already set your statement in stone right now, okay?" Angle added, "It's probably better if you tell the truth now. Okay, because if you wanna look like a liar later, or you just wanna come clean and tell us the truth from the start. Okay?" Defendant denied doing anything and offered to take a lie detector test.

Angle told defendant that he would not be placed under arrest that day, but that defendant was under investigation and that Angle would follow up with more interviews and seize defendant's phone. Angle advised defendant that they would analyze his phone and be able to recover any deleted photographs or text messages, and Angle asked defendant if wanted to tell them anything else. Defendant denied that his phone had photographs of his cousins.

Angle then told defendant that it appeared that defendant had something else that he wanted to say. Defendant admitted that when he was 15 years old, he asked Doe 2 to touch him. Angle thanked defendant for the admission and advised him that Angle believed it was still going on and that defendant had an issue that required talking to someone, but Angle could not do anything about it without knowing the whole truth. Angle told defendant that Angle was just trying to ascertain the truth and that if they believed defendant was "fully guilty, right off the bat," Angle would have put defendant in handcuffs.

Angle told defendant that he needed to tell Angle "what's going on with Jane Doe 1." When defendant responded that he had discussed the matter with his mother, Angle interrupted and said, "[W]e're not gonna, listen—okay.… You've already been cool. Look, you told us about the stuff with Jane Doe 2. Are you in handcuffs? I'm

8.

willing to help you out, okay? I just need to know what happened with Jane Doe 1." Angle advised defendant that he was digging himself a hole and Angle would walk away, but Angle asked defendant one final time what happened with Doe 1.

Defendant said that Doe 1 was lying because of incidents when Doe 1 took his drink and threatened to tell her mother that defendant allowed her to drink alcohol and when he told Doe 1 that he would not take her and her friends to get something to eat anymore. Angle interrupted and told defendant that this was defendant's only time to tell the truth and that Angle had witnesses that knew the truth. Defendant admitted "that did all happen," "[t]he picture" and "everything," but he deleted the pictures. Defendant then stated that he took pictures, but the pictures did not show his penis in their mouths, and they were not naked. Angle told defendant that Angle had witnesses to the events and that he would be able to recover any deleted photographs.

Angle reminded defendant that he was not in handcuffs. Defendant responded, "I will be after, right?" Angle replied, "I'll be fully honest with you after, yeah, absolutely." Angle said that he was not going to handcuff defendant yet, promised that Angle had been lenient with defendant, and asked whether defendant felt intimidated by Angle. Defendant then admitted that he took pictures of Doe 1 with his penis in her mouth on two different occasions.

### E. Digital Evidence

Modesto Police Detective Jon Evers extracted data from defendant's cellular phone and recovered several videos and digital pictures that had been deleted from the memory card contained within the phone. One video, approximately 33 minutes and 22 seconds long, appeared to have been filmed from a camera hidden in a bedroom or bathroom and showed a woman walking back and forth wearing a towel. The woman first appeared nine minutes into the video, and the room went dark 11 minutes and 34 seconds later. Evers also found 54 pictures of a woman asleep on a couch created on

9.

May 30, 2018, between 3:03 and 3:57 a.m., and several short videos depicting the same image. Doe 2 identified herself as the woman asleep in the photographs but had no idea that anyone had taken pictures of her.

## II. Defense evidence.

### A. Amanda Bossom

Amanda Bossom, defendant's mother, testified that Doe 2 is her sister's daughter. Doe 1 is the daughter of Bossom's husband's sister, and Doe 3 is the daughter of Bossom's best friend. Neither Doe 2 nor Doe 3 ever told Bossom that defendant had behaved in a sexually inappropriate manner with them.

### B. Defendant

Defendant testified that Doe 2 and Doe 3 came into his room and orally copulated him at their own instigation. It happened only once because he knew that it was wrong, and he never offered them any enticements to do it. Defendant admitted that he removed his clothes to expose his penis during the incident.

Defendant denied that he had been orally copulated by Doe 1. Defendant testified that he had fought with Doe 1 because he objected to her suggestion that he could "have" her friend and Doe 1 could "have" defendant's friend when Doe 1 and her friend were only 13 years old, and he was older.

Regarding his statement to police officers, defendant also explained that he eventually admitted the conduct because the officers refused to believe he did not do it. Defendant did admit that he lied when he told the officers that Doe 3 tried to orally copulate him when she was four years old.

During cross-examination, defendant admitted that, in 2018, he took several "[p]eeping Tom-like videos" of people who were unaware that they were being videoed. One video was taken of a woman while she was in his house. Defendant also admitted that he videoed a female neighbor's bedroom from a camera he hid on a fence and that he

had hoped to video her naked.  The prosecutor entered two such videos into evidence with the stipulation that no individual was actually videoed.  Defendant admitted that he set up a camera in failed attempts to video his female neighbor naked several times and videoed her one time while she was fully clothed.  The prosecutor questioned defendant regarding a total of eight such videos, and defendant admitted that he set the camera up at night to avoid detection and to video inside his neighbor's bedroom.  Defendant testified that he wanted to capture his neighbor naked so that he could view it later for his own sexual pleasure.

Defendant also admitted that he videoed Doe 2 sleeping for over an hour because he was still interested in her and wanted to look at the pictures later.  He agreed that it is "nasty" to have minors, including individuals related to him, give him oral sex.

## DISCUSSION

**I.**   **The trial court did not err in denying defendant's motion to exclude his statement to law enforcement.**

Defendant argues that the trial court erred in ruling that he was not in custody and entitled to advisements pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) before he was interviewed by Detective Angle.  He also argues that his statement was inadmissible because it was not voluntary.  We reject both arguments.

### A.   Background[4]

Defendant moved to suppress his prearrest statement both because he had not received *Miranda* warnings and because his statement was involuntary.  The trial court reviewed defendant's videoed interview with Detective Angle and the transcription of the interview, the substance of which we set forth, *ante*, in part I.D.

---

**4**     We do not consider Angle's later trial testimony for purposes of reviewing the trial court's ruling and review only the evidence provided to the trial court at the time of its ruling. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

The trial court denied defendant's motion to exclude his statement to law enforcement, concluding that defendant was not in custody for purposes of *Miranda* and that his statement was voluntary based upon the following facts: (1) defendant was not in handcuffs; (2) defendant was told several times that he was not under arrest; and (3) given the opportunity, defendant did not acknowledge or say that Angle was aggressive with him.

**B.** **Defendant Was Not In Custody When Interviewed By Detective Angle and *Miranda* Warnings Were Not Necessary**

*1.* ***Standard of review and applicable law.***

On review of a trial court's decision on a *Miranda* issue, " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of the questioning was recorded, the facts are undisputed, and we independently review the trial court's factual determinations. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of their right to remain silent, that any statement made can be used against them in a court of law, their right to the presence of an attorney, and that if they cannot afford an attorney, one will be appointed. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson*, *supra*, 1 Cal.5th at p. 339.)

*Miranda* applies only to custodial interrogations, and whether a person is in custody hinges on whether a reasonable person in their shoes would feel free to leave. (*Miranda*, *supra*, 384 U.S. at p. 444; *Howes v. Fields* (2012) 565 U.S. 499, 508–509.) There is no dispute that the interview here was an "interrogation," which is defined as express questioning or other words and actions on the part of law enforcement that law

12.

enforcement should know are reasonably likely to elicit an incriminating response from a suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299–301.)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395 (*Moore*).) The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

All the circumstances of the interrogation are relevant to determining whether it was custodial. (*Moore*, *supra*, 51 Cal.4th at p. 395.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).) The most relevant circumstances typically include: "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course

13.

of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid*.)

### 2. *Analysis.*

The circumstances of the interview in this case did not amount to a restraint on defendant's freedom of movement tantamount to a formal arrest. Deputy Angle knocked on defendant's door and greeted him with a friendly "Hi," and Angle referred to defendant as "buddy." Angle was accompanied by only one other officer who stood on the walkway casually leaning against a post. Angle started to suggest that defendant restrain his dog, but then suggested that defendant close the door and speak to Angle on the porch. Angle asked for permission to check defendant for weapons, and defendant agreed to the request. The questioning occurred on defendant's front porch, and he was not handcuffed or otherwise restrained. At the outset of the interview, Angle advised defendant that Angle was investigating an incident with defendant's cousin, and Angle asked defendant questions in a friendly and open tone of voice. Though Angle expressed skepticism at times, he was not accusatory, aggressive, or loud. (See *Aguilera*, s*upra*, 51 Cal.App.4th at p. 1164 ["whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory" is "highly significant" in considering the issue of custody].)

Approximately six minutes and 33 seconds into the interview, Angle advised defendant that he would not be placed under arrest, but Angle intended to seize defendant's phone and it would be searched for evidence. (See *In re Anthony L.* (2019) 43 Cal.App.5th 438, 446 [factors consistent with a noncustodial interrogation included officer telling 15-year-old suspect that he was " 'not under arrest right now' "].) While Detective Angle did advise defendant that the investigation would continue, Angle used

an apologetic tone and did not imply that defendant would be arrested immediately. Moreover, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." (*Stansbury v. California*, *supra*, 511 U.S. at p. 325.) Most importantly, Detective Angle at no time told defendant, or even insinuated, that defendant was unable to leave unless he told Angle what Angle wanted to hear.

Angle provided defendant another opportunity to address whether the phone would contain evidence. Defendant admitted an incident with Doe 2 wherein he asked her to touch him. At approximately eight minutes into the interview, Angle thanked defendant for that information, indicated that more had happened, and suggested defendant might have an issue and should talk to someone. Angle assured defendant that he was searching for the truth and reminded defendant that he was not in handcuffs. Approximately eight minutes and 55 seconds into the interview, Angle interrupted defendant as defendant denied his conduct, advised defendant that Angle would walk away if defendant continued to lie, and offered defendant one last chance to explain his conduct with Doe 1. Angle's demeanor was neither loud, accusatory, nor aggressive but attempted to cajole defendant to tell the truth.

Defendant described to Angle two incidents where defendant and Doe 1 disagreed, and Angle told defendant that Angle had additional witnesses who confirmed the sexual incidents. Defendant then admitted that it all happened but backtracked as to whether he had photographed the incidents. Angle reminded defendant that he was not in handcuffs and claimed that Angle had been honest with defendant. Angle asked whether defendant was intimidated by Angle, and defendant nodded in agreement when Angle stated that he had been cool with defendant.

The interview was only approximately 16 minutes long, was not intense or confrontational, and the Supreme Court has upheld as noncustodial an interview that was

15.

one hour and 45 minutes. (*Moore*, *supra*, 51 Cal.4th at p. 402.) Throughout the entire interview, Angle spoke with defendant in a low and nonthreatening tone and reminded him that he was not under arrest. While defendant argues that Angle unconstitutionally seized defendant's phone and person, Angle did not physically restrain, touch, or take defendant's phone before he was arrested.

We reject defendant's argument that the circumstances of this case are similar to *In re Matthew W.* (2021) 66 Cal.App.5th 392, 409. In that case, while officers did advise Matthew W. that he was not under arrest and the questioning took place at his home, the court found he was entitled to *Miranda* warnings because Matthew was a juvenile, five officers arrived at his home and entered his bedroom while he was asleep and it was still dark, two uniformed and armed officers stood by as he was questioned, he was not permitted to leave to obtain a blanket, and his mother was not permitted to be present during the interview. (*Id*. at pp. 407–408.) In the instant case, defendant was 24 years old when interviewed and none of these other circumstances were present.

Defendant relies upon *Aguilera*, *supra*, 51 Cal.App.4th 1151 and *People v. Torres* (2018) 25 Cal.App.5th 162 to argue that a reasonable person would not have felt free to leave defendant's interview until the detective were satisfied with their answers. Both cases are distinguishable from defendant's case.

In *Aguilera*, the police went to Aguilera's house and asked him and his mother if Aguilera would talk to them at the station about a homicide. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1159.) However, once at the station, the circumstances in *Aguilera* were very different. The police conducted an interrogation that was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Id*. at p. 1165.) The court concluded that the officers conveyed to Aguilera the message that he would be interrogated until he admitted his involvement in the crime. (*Id*. at p. 1163.) That did not happen here. Nothing Detective Angle said or did up until Angle told defendant he was being arrested gave the impression that defendant was not free to leave.

16.

Defendant also relies upon *People v. Torres* to support his argument. In *People v. Torres*, defendant Torres was contacted at his home and placed into a police car to be interviewed. The detectives then told Torres that they would not leave and Torres could not return home until he stopped lying and confessed. (*People v. Torres*, *supra*, 25 Cal.App.5th at p. 179.) However, in the instant case, Angle conducted the questioning on defendant's porch and told defendant that Angle would walk away if defendant lied, leaving defendant free to walk back into his house.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

Defendant's freedom was not so restrained that the interview was tantamount to an arrest. Accordingly, the trial court did not err in concluding that the interview was not custodial and *Miranda* warnings were not required.

### C.      Defendant's Statement to Detective Angle Was Voluntary

#### 1.      *Standard of review and applicable law.*

"When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. [Citation.] On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) "The facts surrounding an admission or confession are undisputed to the extent the

interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*).)

We consider a statement involuntary—and thus subject to exclusion under the Fifth and Fourteenth Amendments to the United States Constitution—if it is the product of "coercive police conduct." (*People v. Williams* (2010) 49 Cal.4th 405, 437.) We evaluate the totality of the circumstances to determine "whether the defendant's ' "will has been overborne …" ' by coercion." (*Id.* at p. 436.) The presence of police coercion is a necessary, but not always sufficient, element. (See *ibid.*)

We also consider other factors, such as the location of the interrogation, whether the interrogation was repeated or prolonged, and the defendant's maturity, intelligence, education, physical condition, and mental health. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Dykes* (2009) 46 Cal.4th 731, 752 (*Dykes*); *Linton*, *supra*, 56 Cal.4th at p. 1178.) We also consider whether the defendant was deprived of food or sleep and whether the officers made threats, direct or implied promises, or used deceptive practices. (*Dykes*, at p. 752.)

The Supreme Court has found a confession not " 'essentially free' " when a suspect's confinement was physically oppressive, invocations of his or her *Miranda* rights were flagrantly ignored, or the suspect's mental state was visibly compromised. (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*), quoting & citing *People v. Neal* (2003) 31 Cal.4th 63 (*Neal*); see *People v. McClary* (1977) 20 Cal.3d 218, 229–230, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510 fn. 17; *People v. Hogan* (1982) 31 Cal.3d 815, 839, 843, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

### 2. *Analysis.*

We are not persuaded the circumstances of defendant's interview demonstrate his statement was coerced. We have watched the lengthy video and are convinced that no police coercion occurred, and Angle did not overbear defendant's will.

As the Supreme Court did in *Spencer*, we begin by noting certain factual predicates missing from defendant's involuntariness claim. (*Spencer*, *supra*, 5 Cal.5th at p. 672.) Defendant makes " 'no claim of physical intimidation or deprivation' and 'no assertion of coercive tactics other than the contents of the interrogation itself.' " (*Ibid*, quoting *People v. Holloway* (2004) 33 Cal.4th 96, 114.) In *Spencer*, the court contrasted these facts with *Neal*, *supra*, 31 Cal.4th 63, "a case in which we held the confession involuntary, in part, because the defendant 'was placed [overnight] in a cell without a toilet or a sink,' 'did not have access to counsel or to any other noncustodial personnel,' 'was not taken to a bathroom or given any water until the next morning,' and 'was not provided with any food until some time following the third interview, after more than 24 hours in custody and more than 36 hours since his last meal.' " (*Spencer*, at p. 672, quoting *Neal*, at p. 84.)

The 16-minute interview in the instant case was not unduly long, and defendant never asked for it to stop. No physical punishment occurred, and defendant was not deprived of food or sleep. Detective Angle did not subject him to either repeated or prolonged questioning. The nature of the questioning and the length of this interview do not establish that defendant's will was overborne. (See *Dykes*, *supra*, 46 Cal.4th at p. 752.) Detective Angle was polite and did not threaten defendant in exchange for his admissions. The questioning was not abusive. Nothing in the video indicates that defendant felt coerced in the constitutional sense of the term at any time while he was being questioned.

Like *Spencer*, "[w]e also find significant [Detective Angle]'s conduct, and [defendant]'s response to it." (*Spencer*, *supra*, 5 Cal.5th at p. 673.) As in *Spencer*, while

19.

Detective Angle expressed skepticism at some of defendant's statements and eventually told defendant that he had witnesses that contradicted defendant, he refrained from "vituperative statements," name-calling, any obvious strong-arm tactics, and "base appeals to [defendant]'s deeply held beliefs." (*Ibid*.) As in *Spencer*, defendant "gave coherent, responsive answers and did not appear excessively fearful or distressed." (*Ibid*.) Similarly, defendant "also had the wherewithal to articulate—time and again—a version of events that minimized his involvement," before finally admitting to his actions. (*Ibid*.)

Unlike *Spencer*, defendant did not receive *Miranda* warnings. However, we find warnings were not necessary in this case because defendant was not in custody. Additionally, defendant never invoked his right to counsel, and, unlike *Neal*, this was not a case where defendant was advised of his rights, invoked them but, nonetheless, officers disregarded the request. (See *Neal*, *supra*, 31 Cal.4th at p. 74.) As the Supreme Court noted in *Spencer*, "[t]hese missing elements distinguish Spencer's case from those where we have found the confession to be involuntary." (*Spencer*, *supra*, 5 Cal.5th at p. 673; see *id*. at p. 672 ["suspect invoked both his right to remain silent and his right to counsel—the latter ' "probably" "7 to 10 times" '—only to be deliberately ignored so that the detective could 'obtain a statement' "], distinguishing *Neal*, at p. 74.)

Here, Detective Angle did not raise the possibility of a greater punishment if defendant failed to confess nor promise leniency should he confess. Angle reminded defendant that he was not in handcuffs but, when defendant responded, "I will be after, right?" Angle replied, "I'll be fully honest with you after, yeah, absolutely." Angle said that he was not going to handcuff defendant yet, promised that he had been lenient with defendant, and asked whether defendant felt intimidated by Angle. The Supreme Court has held that, "a constitutional violation will be found 'only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative,

coupled with a "promise [of] leniency in exchange for the suspect's cooperation." ' " (*Spencer*, *supra*, 5 Cal.5th at p. 675.)

Defendant argues that several of Detective Angle's statements demonstrate his use of positive and negative incentives to induce a confession: (1) it was better to tell the truth; (2) police could not proceed without having the truth; (3) Angle was willing to help defendant and was the perfect person to whom defendant should confess; and (4) that Angle had been lenient with defendant. We cannot conclude that any of these statements were sufficient to coerce defendant to confess. *Spencer* rejected any conclusion that certain interrogation techniques amounted to coercion. (See *Spencer*, *supra*, 5 Cal.5th at p. 674.) Confronting a defendant with inconsistencies in his statement is "not an improper interrogation technique, as an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*Ibid.*; see *Linton*, *supra*, 56 Cal.4th at p. 1178 [officers can exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying]; *People v. Williams*, *supra*, 49 Cal.4th at p. 444 [officers can engage in vigorous and repetitive questioning of suspects meant to ascertain a defendant's involvement in crimes].) This is especially so where the officer's exhortations and persistent questions are relatively "low key" as they were in this case. (*Linton*, at p. 1178.) The law is clear that " 'mere advice or exhortation by police that it would be better for the accused to tell the truth' " does not render a subsequent confession involuntary. (*People v. Holloway*, *supra*, 33 Cal.4th at p. 115; see *People v. Carrington* (2009) 47 Cal.4th 145, 172 ["when law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises"]; *People v. Orozco* (2019) 32 Cal.App.5th 802, 820 ["Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes or of pointing out the benefits that are likely to flow from cooperating with an investigation."].)

Additionally, Detective Angle's overstated representation that he could recover deleted photographs or that he had witnesses to the events does not warrant a finding of involuntariness " '[w]here the deception is not of a type reasonably likely to procure an untrue statement.' " (*Spencer*, *supra*, 5 Cal.5th at p. 675 [finding no error in officer's false representation that the defendant's fingerprints were found at scene]; see also *People v. Smith* (2007) 40 Cal.4th 483, 506 [representation that fake " 'Neutron Proton Negligence Intelligence Test,' " detected gun powder residue on the defendant's hands was not so coercive that it tended to produce a statement that was involuntary or unreliable].)

Defendant was 24 years old when interrogated, and the record gives no reason to suspect he suffered from any physical or mental disability, or that his mental acuity was lacking. At no point during the interrogation did defendant appear physically or emotionally distressed. (See, e.g., *Spencer*, *supra*, 5 Cal.5th at p. 673.) Defendant's " 'physical state' and 'personal characteristics' do not strike us as sufficient bases to disturb the trial court's decision to admit his confession." (*Id*. at p. 676 [rejecting claim that the defendant's cough diminished his mental faculties or made him especially vulnerable to officer's questioning], quoting *Dykes*, *supra*, 46 Cal.4th at p. 753 [rejecting the defendant's claim that "his decision to confess was based upon his youth and his absence of experience with the criminal justice system" since "there was no indication of police exploitation of these circumstances"].)

Based on the totality of the circumstances, the prosecution met its burden of establishing by a preponderance of the evidence that defendant's statement was voluntary. We reject any assertion that Detective Angle brought influences upon defendant that overcame his will to resist. Both defendant's characteristics and the details of this interview establish that his confession was free of coercion. Accordingly, defendant's interview was admissible at his trial, and the trial court did not err in denying defendant's motion to exclude or suppress his statement.

**II.** **Defendant has failed to show that defense counsel was ineffective in failing to move to suppress the contents of his cellular phone.**

**A.** **Background**

The clerk's transcript provides no indication that defense counsel moved to suppress evidence seized from defendant's cellular phone. Defendant argues that the search of defendant's phone was conducted without a warrant and defense counsel was ineffective for failing to move to suppress the digital evidence recovered in the search. We conclude that the record is insufficient for us to evaluate this claim.

**B.** **Standard of Review and Applicable Law**

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) "To demonstrate deficient performance, [a] defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, [a] defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the

presumption that counsel's actions fall within the broad range of reasonableness and afford 'great deference to counsel's tactical decisions.' " (*Ibid.*)

"Accordingly, [our Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) If the record fails to disclose why trial counsel acted or failed to act in the manner challenged, the ineffective assistance of counsel claim must be rejected unless counsel was asked for and failed to provide an explanation, or there could be no plausible explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

## C.  Analysis

Defendant has not demonstrated that his attorney performed deficiently by not moving to suppress the evidence from a warrantless search of his phone. Defendant argues that his phone was searched illegally and without a warrant based upon a declaration from a deputy clerk of the Stanislaus Superior Court. According to the declaration, the deputy clerk searched defendant's file (*People v. Deichman* (Super. Ct. Stanislaus County, 2021, No. CR-18-002974)) and determined that it does not contain a search warrant. However, the declaration fails to establish that the search warrant does not exist as part of some other file in the records of the Stanislaus Superior Court and is insufficient to establish that police did not obtain a search warrant for defendant's phone. Because defendant has failed to establish that police did not obtain a search warrant for his phone, it is possible that defense counsel did not move to suppress the evidence because the evidence was seized pursuant to a lawfully issued search warrant.

"A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record." (*People v. Cunningham* (2001) 25 Cal.4th

926, 1003.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, … the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.) The record here does not exclude the possibility that a search warrant for defendant's phone exists. Because (1) the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, (2) counsel was not asked for an explanation and failed to provide one, and (3) there could be a satisfactory explanation for counsel's approach, defendant's claim on appeal must be rejected. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; see *People v. Weaver* (2001) 26 Cal.4th 876, 926 ["where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions"]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 437 [there is a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' "]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [generally, a reviewing court "may not second-guess" trial counsel's strategic and tactical choices].)

We conclude that defendant has failed to demonstrate that his trial counsel was ineffective.

## III. The trial court abused its discretion in admitting videos made by defendant of a neighbor pursuant to Evidence Code section 1108, but the error is harmless.

### A. Background

The trial court addressed the prosecutor's request to admit uncharged sexual act evidence prior to trial. After the trial court ruled that the testimony of Doe 2 and Doe 3 could be introduced pursuant to Evidence Code section 1108, the prosecutor indicated that it would also move to admit nine photographs (eight of one victim and one picture of defendant), four videos of the same victim depicted in the photographs, and one video of a woman in a towel who was unaware she was being videoed. The prosecutor argued that even though the woman in the fifth video was unidentified, defendant violated

section 647, subdivision (j)(3)(a) when he videoed her in her bedroom unawares. Because Doe 1 would testify that defendant photographed her with his penis in her mouth and defendant photographed Doe 2 while she was sleeping, evidence of videoing the neighbor would prove his propensity to commit the crimes.

The trial court noted defendant's objection to the evidence but did not otherwise rule on its admission. When the prosecutor moved the videos into evidence, defense counsel advised the trial court that he had no objection to its admission. The prosecutor later cross-examined defendant and displayed additional videos he created by setting up a hidden camera to video inside his neighbor's bedroom. The trial court, at defense counsel's request, instructed the jury with CALCRIM No. 1191A twice during testimony and again before closing arguments. CALCRIM No 1191A instructed the jury that the prosecution presented evidence of uncharged violations of sections 288, subdivision (a) and 647, subdivision (j)(1), that the jury could only consider such evidence if it found the prosecution proved defendant committed the offenses by a preponderance of evidence, that the jury could conclude from the evidence that defendant was inclined to and likely to commit the charged offenses, but that such a conclusion was only one factor to consider along with all the other evidence and insufficient by itself to prove defendant committed the charged offenses, and that the People still must prove the charged offenses beyond a reasonable doubt.

## B.    Applicable Law and Standard of Review

In general, evidence of a defendant's conduct other than what is currently charged is not admissible to prove that the defendant has a criminal disposition or propensity. (Evid. Code, § 1101, subd. (a).) Uncharged conduct evidence is admissible, however, when relevant to prove a fact other than the defendant's criminal disposition, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393,

superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) "But Evidence Code section 1108, subdivision (a) provides an exception to this rule: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352.' Evidence Code section 352, in turn, provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'In short, if evidence satisfies [Evidence Code] section 1108, and is not excluded under [Evidence Code] section 352, admission of that evidence to prove propensity is permitted.' [Citation.] As a reviewing court, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice." (*People v. Dworak* (2021) 11 Cal.5th 881, 899, third bracketed insertion in original.)

Our Supreme Court has explained that Evidence Code section 1108 "provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) Various factors are included in "the trial court's discretionary decision to admit propensity evidence under [Evidence Code] sections 352 and 1108." (*Id*. at p. 919.) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such

as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense."  (*Id*. at p. 917.)

We will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Dworak*, *supra*, 11 Cal.5th at pp. 899–900, citing *People v. Miles* (2020) 9 Cal.5th 513, 587, 587–588.)

### C.    Analysis

#### 1.    *The trial court abused its discretion in admitting evidence of defendant's nonsexual offenses and instructing the jury to infer propensity to commit the charged offenses.*

Defendant argues that the trial court abused its discretion in admitting his attempts to video his neighbor's bedroom activities because section 647 is not a sexual offense for purposes of Evidence Code section 1108.  The People respond that defendant's violation of section 647 "was sexual in nature" and that the evidence was admissible as other crimes evidence pursuant to Evidence Code section 1101, subdivision (b).  We conclude that because section 647 is not specifically enumerated in Evidence Code section 1108 and defendant's conduct was not otherwise included in the definition of "sexual offense," the trial court abused its discretion in admitting the evidence pursuant to Evidence Code section 1108 and erred in instructing the jury that it could conclude from such evidence that defendant was disposed to and likely to commit the charged offenses.

Evidence Code section 1108 defines "sexual offense" as "a crime under the law of a state or of the United States that involved any of the following:  [¶]  (A) Any conduct proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former

Section 288a of, the Penal Code." (Evid. Code, § 1108, subd. (d)(1)(A).)[5]  The trial court admitted evidence of defendant's surreptitious videoing of defendant's female neighbor as an uncharged sexual offense in violation of section 647, subdivision (j)(1), which proscribes viewing the interior of a bedroom or bathroom with intent to invade the privacy of a person or persons inside, and instructed the jury that this evidence could be used by the jury to conclude that defendant was likely to commit the charged crimes as one non-dispositive factor to consider in deciding defendant's guilt (see CALCRIM No. 1191A).

"Sexual offenses" made admissible by section 1108 are precisely defined by the statute.  Defendant's uncharged conduct is not within the statutory definition and is thus inadmissible character evidence under section 1101, subdivision (a).  "If a defendant's 'uncharged conduct is not within the statutory definition [of "sexual offense"] …' it constitutes 'inadmissible character evidence under [Evidence Code] section 1101, subdivision (a).' " (*People v. Jandres* (2014) 226 Cal.App.4th 340, 353, second bracketed insertion added, quoting *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1119 (*Nguyen*).)  The People have failed to cite any authority for its position that any conduct "sexual in nature" is admissible pursuant to Evidence Code section 1108, nor are we aware of any case so holding.  While the evidence may be admissible pursuant to Evidence Code section 1101, subdivision (b) to prove something other than defendant's propensity to engaged in the charged offenses, the trial court's instructions to the jury did not so limit the evidence.

---

**5**    Evidence Code section 1108, subdivisions (d)(1)(B) though (F) describe other types of conduct included within the definition of "sexual offense" that are not applicable here:  "(B) Any conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem.  [¶]  (C) Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person.  [¶]  (D) Contact, without consent, between the genitals or anus of the defendant and any part of another person's body.  [¶]  (E) Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person.  [¶]  (F) An attempt or conspiracy to engage in conduct described in this paragraph."

### 2. *Harmless error.*

However, we agree with the People that admission of the evidence that defendant attempted to video his neighbor in a state of undress for his sexual pleasure and the trial court's instruction to the jury as to use of this evidence was harmless.

Absent a "miscarriage of justice," we may not reverse the judgment. (Cal. Const., art. VI, § 13.) The court's admission of the propensity evidence of defendant's attempts to video his neighbor did not prejudice defendant. The People's case was very strong as to each count. (See *Nguyen*, *supra*, 184 Cal.App.4th at p. 1120 [error in admitting nonsexual offense uncharged conduct pursuant to Evidence Code section 1108 harmless in light of the strength of evidence and court's use of CALCRIM No. 1191 to instruct the jury on the use of the evidence.].) Doe 1's testimony as to counts 1 through 6 was supported by Doe 2 and Doe 3 who both testified to defendant's uncharged sexual offenses committed on them. Defendant admitted in his testimony that he did cause Doe 2 and Doe 3 to orally copulate him when they were eight and 10 years old and he was 15 years old, thereby providing supporting testimony for their testimony as to uncharged sexual offenses and support for Doe 1's testimony as to the charged offenses. In addition, defendant admitted to Angle, during his videoed interview, that he took two photographs of Doe 1 while his penis was in her mouth. Defendant also admitted that he took photographs of Doe 2 while she was sleeping because he was "still interested" in her, which the jury could have inferred related to a sexual interest. Defendant's testimony supported Doe 2's testimony that defendant caused her to orally copulate him when she was 15 years old (charged in count 7). This evidence also supported Doe 1's testimony that defendant forced her to orally copulate him and photographed her while he abused her.

As in *Nguyen*, the trial court here instructed the jury pursuant to CALCRIM No. 1191A that evidence of the uncharged conduct was insufficient to prove defendant guilty of the charged sexual offenses and that the People were still required to prove

defendant guilty of aggravated sexual assault of a child, lewd acts on a child, using minor for posing or modeling involving sexual conduct, and annoying/molesting a child " 'beyond a reasonable doubt.' " (*Nguyen*, *supra*, 184 Cal.App.4th at p. 1120.)

Defendant argues that the prosecutor's closing argument contributed to the prejudicial impact of the erroneously admitted evidence because she argued that "the Peeping Tom videos" were "nasty," "creepy," "unsettling," and showed defendant was a sexual deviant. However, defendant testified that he did cause Doe 2 and Doe 3 to put his penis in their mouths when he was 15 years old. He also admitted that he photographed Doe 2 for an hour while she was sleeping because he was still interested in her. The prosecutor's comments, therefore, were equally applicable to defendant's admissible conduct in photographing a sleeping 15-year-old girl in whom defendant was sexually interested (and arguably more unsettling than photographing an adult) even if the evidence of his videoing the neighbor should have been excluded.

Therefore, we conclude that it is not "reasonably probable" the jury would have acquitted defendant even if the propensity evidence of defendant's nonsexual conduct in videoing his neighbor had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [applying *Watson* standard].)

IV.     **The trial court's instruction that the jury could infer propensity to commit the charged offenses by evidence of defendant's uncharged nonsexual offenses did not violate due process.**

Defendant argues that his right to due process under the Fourteenth Amendment of the United States Constitution was violated when the trial court instructed the jury that it could infer his propensity to commit the charged sexual offenses from defendant's conduct in attempting to invade his neighbor's reasonable expectation of privacy by videoing her bedroom activities. Defendant argues that the permissive inference contained in CALCRIM No. 1191A relieved the government of the burden of proving all charged offense elements beyond a reasonable doubt. We disagree.

31.

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *In re Winship*, 397 U.S. [358], at 364. This 'bedrock, "axiomatic and elementary" [constitutional] principle,' *id*., at 363, prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." (*Francis v. Franklin* (1985) 471 U.S. 307, 313.) When a "trier of fact" is permitted "to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts," "it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 156–157.)

Defendant argues that the inference permitted by CALCRIM No. 1191A in this case, that a nonsexual offense could be used to infer defendant's propensity to commit a sexual offense, was irrational and violated due process. While we do not necessarily agree that defendant's conduct in videoing a neighbor for his sexual pleasure could not support a rational inference that defendant would also record his sexual abuse of a minor victim (as charged in count 6), we do not consider whether the inference was rational as defendant's argument fails because of the nature of the inference in this case. The inference described in CALCRIM No. 1191A and provided for in Evidence Code section 1108 does not permit the trier of fact to "determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts." (*Ulster County Court v. Allen*, *supra*, 442 U.S. at p. 156.) The instruction here allowed the jury to infer that defendant was disposed to commit the charged offenses, but such predisposition is not an element of any of the charged offenses. "Propensity was, of course, not an element of any of the charged crimes. And

32.

the instructions specified that the uncharged offense was not sufficient alone to prove the charged offenses and reminded the jury the People still had the burden to prove each charge beyond a reasonable doubt. Accordingly, 'there is no reasonable likelihood the instruction on uncharged offenses relieved the prosecution of its burden of proof with respect to the charged offenses.' " (*People v. Jandres*, *supra*, 226 Cal.App.4th at p. 359.)

We conclude that any trial court error in instructing the jury with CALCRIM No. 1191A regarding defendant's nonsexual offenses did not violate due process because it did not permit the jury to infer the existence of any offense element, it did not relieve the prosecution of proving every element of every offense beyond a reasonable doubt, and the admission of the evidence and the court's instructions for its use was, as we discussed *ante*, in part III.C.2., harmless.

## DISPOSITION

The clerk of the superior court shall prepare an amended abstract of judgment removing the $900 probation report fee at paragraph 12 of the indeterminate abstract of judgment, filed on October 28, 2021, and forward it to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.


HILL, P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.

33.